UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOSEPH P. CAMPANELLI,

                          Plaintiff,

          v.

FLAGSTAR BANCORP, INC.,

                        Defendant.

19 Civ. 7299 (PAE)

<u>OPINION & ORDER</u>

---

PAUL A. ENGELMAYER, District Judge:

Plaintiff Joseph P. Campanelli brings this action against his former employer, Flagstar Bancorp, Inc. ("Flagstar"), for failing to uphold its end of two compensation agreements. As President and CEO of Flagstar's bank subsidiary Flagstar Bank F.S.B. ("Flagstar Bank" or the "Bank"), Campanelli negotiated a $14 million Supplemental Executive Retirement Plan ("SERP") payment and, after his resignation, a $1.8 million consulting agreement. Both payments have come due. Campanelli alleges that Flagstar—a "troubled" bank—has improperly failed to seek the necessary regulatory approval to make them. Campanelli therefore alleges a violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), for failure to make the SERP payment; breach of contract as to both compensation agreements; and, in the alternative, breaches of the implied covenant of good faith and fair dealing as to both compensation agreements. *See* Dkt. 17 ("Compl.").

Before the Court is Flagstar's motion to dismiss Campanelli's Complaint in its entirety. For the reasons that follow, the Court grants the motion in part and dismisses the Complaint's two claims for breach of the implied covenant. The Court denies, however, Flagstar's motion to dismiss the remaining claims.

I.      **Background**[1]

A.      **The Parties**

Campanelli is a Massachusetts resident.  Compl. ¶ 1.  He served as the President and CEO of Flagstar Bank between September 2009 and November 2012.  *Id.* ¶¶ 20, 32.  Following his resignation from those positions, he entered into a six-month consulting agreement with Flagstar.  Dkt. 17-2 ("Consulting Agreement") at 2.

Flagstar is a Michigan corporation with headquarters in Troy, Michigan.  Compl. ¶ 2.  It operates Flagstar Bank.  *See id.* ¶ 6.  Flagstar's stock is publicly traded on the New York Stock Exchange.  *Id.* ¶ 2.  As discussed in greater detail below, Flagstar Bank was subject to several remedial agreements with its federal regulators entered during, or shortly after, Campanelli's tenure as CEO.  In 2010, Flagstar and the Bank were required to enter into Supervisory Agreements (the "OTS Agreements") with the Office of Thrift Supervision ("OTS").  *Id.* ¶ 21. In 2012, another regulator, the Office of the Comptroller of the Currency ("OCC"), required the Bank to enter into a Consent Agreement (the "OCC Consent Order").  *Id.* ¶ 31.  And in 2014, after Campanelli had left the Bank, the Consumer Financial Protection Bureau ("CFPB") required the Bank to enter into a Consent Order (the "CFPB Consent Order").  *See id.* ¶¶ 57–58. The parties dispute how these remedial agreements bear on Campanelli's claims.

---

[1] The Court draws the facts in this decision principally from the Complaint and its attached exhibits, as supplemented by those exhibits attached to the declaration of Jacob E. Cohen, Esq., Dkt. 20 ("Cohen Decl."), that are incorporated by reference into or are integral to the Complaint. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").  For purposes of the motion to dismiss under Rule 12(b)(6), the Court accepts all factual allegations in the Complaint as true, drawing all reasonable inferences in Campanelli's favor.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

### B.     Facts

Campanelli joined Flagstar Bank in September 2009, *id.* ¶ 20, at a time when the bank—which had been heavily involved in mortgage lending—was struggling with the fallout of the 2008 financial crash, *id.* ¶¶ 6–9.  Commensurate with his mission to "turn the bank around and save it from going under," *id.* ¶ 9, Campanelli negotiated a generous compensation package, *id.* ¶¶ 11, 15.  Key to this was the Supplemental Executive Retirement Plan ("SERP") payment, which the parties agreed would be paid to him "upon the later of his separation from the bank or his attaining the age of 62."  *Id.* ¶ 11; *see also* Dkt. 17-1 ("Employment Agreement") § 1.06.[2] The SERP payment was to be a lump-sum payment with the exact amount "determined by a formula stated in the Employment Agreement"; however, "Flagstar projected that the SERP [p]ayment would be valued at approximately $14 million if paid on [Campanelli's] 62nd birthday."  *Id.* ¶ 15.

The parties anticipated at the outset that, "given the troubled status of the bank," the SERP payment "might qualify and potentially be restricted as a 'Golden Parachute Payment'" under 12 C.F.R. § 359 *et seq.* (the "Golden Parachute Regulations"), *id.* ¶ 16; *see also* 12 U.S.C. § 1828(k), or otherwise violate the requirements of the Treasury Department's Troubled Asset Relief Program ("TARP").[3]  Campanelli's Employment Agreement therefore provided that "[i]n

---

[2] Section 1.06 of the Employment Agreement refers to the SERP as the "Supplemental Retirement Pension," and the SERP payment as the "Supplemental Retirement Benefit."  *See* Employment Agreement § 1.06.  For consistency, the Court follows the nomenclature of the Complaint.

[3] As relevant here, a "golden parachute payment" is "any payment . . . in the nature of compensation by [a covered financial institution] . . . for the benefit of any current or former [employee] . . . that is contingent on, or by its terms is payable on or after[] the termination of such party's primary employment or affiliation with the institution . . . and is received on or after . . . a determination by [a relevant regulator] . . . that the [institution] is in a troubled condition."  *See* 12 C.F.R. § 359.1(f)(1)(i); *id.* § 359.1(f)(1)(ii)(C).  Federal Deposit Insurance

the event of any such violation, the Parties will cooperate in good faith to endeavor to meet the TARP [r]equirements and other applicable law in a manner which preserves to the greatest extent possible the intent and purposes of th[e] Agreement." *See* Employment Agreement § 4.02; *see also* Compl. ¶¶ 17–18.

Campanelli further alleges that "Flagstar told [him], before he signed the Employment Agreement, that it had sought and obtained advance regulatory clearance for the SERP payment on the ground that [he] was a 'white knight.'" Compl. ¶ 19. That assurance, however, was not memorialized in the Employment Agreement. Furthermore, the Agreement provided that "[n]otwithstanding anything in this Agreement to the contrary, in no event shall any payment, award or benefit under this Agreement vest or be settled, paid or accrued, if [that] would be in violation of the TARP [r]equirements or other applicable law." *See* Employment Agreement § 4.02. The Agreement also specifically addressed the Golden Parachute Regulations, providing that:

> If any payment or benefit to [Campanelli] under this Agreement or otherwise would be a "Golden Parachute Payment" that is prohibited by applicable law, then the total payments and benefits will be reduced to the Golden Parachute limit. For purposes of this Section . . . "Golden Parachute Payment" means a golden parachute payment within the meaning of Section 18(k) of the Federal Deposit Insurance Act and "Golden Parachute Limit" means the greatest amount of

Corporation ("FDIC") regulations provide that "no insured depository institution . . . shall make or agree to make any golden parachute payment, except as provided in this part." *Id.* § 359.2. To make a golden parachute payment, a covered institution must seek the permission of its regulators and, *inter alia*, certify that, as relevant here, "it does not possess and is not aware of any information, evidence, documents or other materials which would indicate that there is a reasonable basis to believe, at the time such payment is proposed to be *made*" that the payee "has committed any fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse . . . that has had or is likely to have a material adverse effect on the institution"; "is substantially responsible for the insolvency of, the appointment of a conservator or receiver for, or the troubled condition" of the institution; or "has materially violated any applicable federal or state banking law or regulation that has had or is likely to have a material effect on the" institution. *Id.* § 359.4(a)(4) (emphasis added).

payments and benefits that could be made to [Campanelli] without having any payment or benefit be a Golden Parachute Payment.

*Id.* § 3.12.

Campanelli alleges that the Bank's financial condition improved dramatically on his watch, with Flagstar's total stockholders' equity increasing by 146% from 2008 and net income per share increasing from -$3.82 to $0.88.  Compl. ¶¶ 22–25.  Consistent with this, he alleges that he received "consistently excellent performance evaluations" during his tenure.  *Id.* ¶ 23.  Notwithstanding this success, the Bank was required to enter into two remedial agreements with its regulators during Campanelli's tenure.  First, in 2010, Flagstar and the Bank were required to enter into the OTS Agreements because of "serious problems" which Campanelli alleges "preexisted [his] tenure at the [B]ank."  *Id.* ¶ 21.  Then, in 2012, the Bank was required to enter into a Consent Order with OCC due to "ongoing concerns about the [B]ank's capital position due to . . . problems that" Campanelli alleges also predated his arrival.  *Id.* ¶ 31.

In November 2012, after three years at the helm of the Bank, Campanelli resigned.  *Id.* ¶ 32.  The parties thereafter executed two more agreements: a separation and release agreement, *id.* ¶ 33; *see also* Cohen Decl., Ex. 1 ("Separation Agreement"), and the Consulting Agreement, to compensate Campanelli for services he would provide to the Bank in the six months after his resignation, *see* Compl. ¶¶ 35–36; *see also* Consulting Agreement.

Relevant here, the Separation Agreement memorialized the parties' agreement to "accelerate [the SERP] payment" to Campanelli.  Thus, the agreement provided that Flagstar:

shall use its reasonable best efforts to seek and obtain approval from all appropriate regulatory authorities to accelerate payment to [Campanelli] of the [SERP payment] . . . .  [S]ubject to (i) receipt of such approval which shall not contain any prohibition against [Flagstar] taking such action as contemplated in this [s]ection, (ii) [Flagstar]'s determination that such actions will not violate any applicable laws, and (iii) the other provisions of this [s]ection, [Flagstar] shall

5

> take such actions as are necessary to [make the SERP payment] . . . in accordance
> with the provisions of [TARP] as soon as practicable after the Effective Date . . . .

Separation Agreement § 3.  It further provided that:

> if [Flagstar] is unable to obtain the necessary regulatory approvals to accelerate
> the payment to [Campanelli] of the Supplemental Retirement Benefit, then
> Section 1.06 . . . of the Employment Agreement shall not be amended, and
> [Flagstar] will pay the [SERP] [b]enefit at the time and pursuant to the procedures
> set forth in . . . the Employment Agreement and subject to the terms and
> conditions . . . of the Employment Agreement [relating to the SERP].

*Id.*

The Consulting Agreement entitled Campanelli to "fees totaling approximately $1.8 million" in exchange for his "agree[ing] to assist in the transition to Flagstar Bank's new CEO, . . . facilitat[ing] the sale of the bank's New England commercial loan and lease positions, and . . . provid[ing] other assistance to Flagstar after the end of his employment."  Compl. ¶ 36. "As with the SERP [p]ayment," the parties anticipated that the consulting payment "might implicate the Golden Parachute [r]egulations and be restricted by them."  *Id.* ¶ 37.  The Consulting Agreement therefore provided that:

> Notwithstanding anything herein to the contrary, if the [f]ees provided for herein
> would cause [Flagstar] to contravene any law, regulation or policy applicable to
> [it], the [p]arties agree that such [f]ees will be paid only to the extent permitted by
> law, regulation and policy.  Without limiting the foregoing, any [f]ee or
> component thereof paid by [Flagstar] hereunder shall be subject to the provisions
> of [the Golden Parachute Regulations,] 12 C.F.R. Part 359.  If a federal regulatory
> agency determines that this agreement or any fee or component thereof paid by
> [Flagstar] hereunder is deemed to violate the [Golden Parachute Regulations],
> [Flagstar] shall exercise its best reasonable efforts to obtain the approval of the
> Board of Governors of the Federal Reserve System, and the concurrence of the
> FDIC, to make the payments provided herein (or, to the extent that they will not
> approve payment in full, such lesser portion as shall be acceptable to them and to
> [Campanelli]).  In the event that [Flagstar] is not successful in obtaining said
> approvals, the Company's obligation to pay any such [f]ee payment shall be null
> and void and the provisions in this Agreement regarding such [f]ee shall be
> deemed null and void.

Consulting Agreement § 13.

After Campanelli's departure from the Bank, outside counsel for Flagstar wrote to the Federal Reserve and FDIC requesting a determination that the consulting payment, Compl. ¶ 40, and the SERP payment, *id.* ¶ 41, were permissible.  As to the consulting payment, Flagstar took the position that it was not a golden parachute payment, but sought confirmation from the regulators "out of an abundance of caution."  Cohen Decl., Ex. 2 ("Oct. 2012 Letter") at 2.  As to the SERP payment, Flagstar "recognize[d] that making the SERP [p]ayment as contemplated under the [Separation Agreement] is a golden parachute payment" but "request[ed] that the Federal Reserve and the FDIC approve" it.  Cohen Decl., Ex. 3 ("Nov. 2012 Letter") at 3. Flagstar's letter acknowledged the 2010 OTS Agreements and the 2012 OCC Consent Order, but stated that Flagstar "believe[s] that [Campanelli] was not responsible for or involved in any activities [Flagstar] would deem to be materially detrimental to the safety and soundness of the institution.  To the contrary, [Flagstar] believe[s] that Mr. Campanelli provided substantial value to . . . the Bank during his tenure[.]"  *Id.*; *see also* Compl. ¶ 42.

On November 27, 2012, the FDIC replied with a letter stating its opinion that "the [C]onsulting [A]greement has the characteristics of a golden parachute payment" and requesting additional information from Flagstar.  Compl. ¶ 43.  On January 15, 2013, counsel for Flagstar responded.  *Id.* ¶ 44; *see also* Cohen Decl., Ex. 4 ("Jan. 2013 Letter").

Separately, on February 19, 2013, counsel for Flagstar provided the Federal Reserve and FDIC with a certification executed by Flagstar's Board of Directors in support of its request for permission to make the SERP payment.  Compl. ¶¶ 45–46; *see also* Cohen Decl., Ex. 5 ("Feb. 2013 Letter").  The Board reiterated its support for Campanelli and further stated that:

> the Board believes that the Bank was in poor financial condition before [Campanelli] was hired, and the Board believes that even though the Bank continued to be regarded as in 'troubled condition' for regulatory purposes at the conclusion of his employment, [Campanelli's] actions did not exacerbate the

7

problems or weaken the financial condition of the Bank or [Flagstar] . . . . Accordingly, the Board believes that the current financial condition of the Bank should not prevent [Flagstar] from accelerating the [SERP] payment to [Campanelli]."

Dkt. 17-3 ("SERP Certification") at 2; *see also* Compl ¶¶ 45–46.

On May 1, 2013, the FDIC responded, asking for additional information. Compl. ¶ 47. On May 31, 2013, Michael Flynn, Flagstar's General Counsel, replied with answers to the FDIC's questions about the Consulting Agreement. *Id.* ¶ 48; *see also* Cohen Decl., Ex. 6 ("May 2013 Letter"). In that same letter, Flagstar also withdrew, with Campanelli's consent, the Bank's request that the Federal Reserve and FDIC approve the accelerated payment of the SERP benefit. Compl. ¶ 49; May 2013 Letter at 1, 7. As a result of this withdrawal, the terms of the Employment Agreement were reinstated and Campanelli's SERP payment became due—subject to regulator approval—in August 2018 when he turned age 62. Compl. ¶ 49. Approval for the consulting payment remained pending.

Campanelli alleges that, sometime after it appointed a new CEO in mid-2013, Flagstar ceased its efforts to obtain regulatory clearance for the consulting payment. *Id.* ¶ 50. Campanelli alleges that he was under the impression that Flagstar was continuing to seek regulatory approval for the consulting payment until October 2016, when Flagstar's outside counsel responded to an inquiry from Campanelli by stating that "Flagstar cannot and will not make [the consulting payment]" because doing so would require it to seek approval from the Bank's regulators, which Flagstar's letter stated—for the first time—that it would not do. *Id.* ¶¶ 55–56. Specifically, the letter stated that "Flagstar has concluded that it cannot certify that the condition of Flagstar did not deteriorate during Mr. Campanelli's tenure, nor can it certify that 'it does not possess and is not aware of any information, documents or other materials which would indicate that there is a reasonable basis to believe . . . [that Mr. Campanelli] materially violated

8

any applicable federal or state banking law or regulation that has had or is likely to have a material effect on [Flagstar or the Bank].'" Cohen Decl., Ex. 7 ("Oct. 2016 Letter") at 3 (alterations and ellipses in original) (quoting 12 C.F.R. § 359.4(a)(4)).  Flagstar's letter indicated that this conclusion "is supported by myriad facts" but gave just one "example": the 2014 CFPB Consent Order.  *Id.*; *see also* Compl. ¶¶ 57–58.  Campanelli alleges that this justification is "nonsense," Compl. ¶ 61, and characterizes Flagstar's about-face as "a bad faith, baseless effort to avoid paying [him] what it owes him," *id.* ¶ 50.

In follow-up correspondence with Flagstar's counsel, Campanelli took the position that Flagstar was in breach of the consulting agreement.  *Id.* ¶ 62.  Flagstar reiterated that it "cannot make the certifications required under the Golden Parachute Regulations to request an exception" that would allow it to pay the consulting fee, and suggested that Campanelli contact the Federal Reserve and FDIC directly to seek "a determination that payments under the Consulting Agreement are not golden parachute payments or for permission to make the payment."  Cohen Decl., Ex. 8 ("Nov. 2016 Letter") at 1; *see also* Compl. ¶ 63.  Campanelli alleges that Flagstar "made this suggestion because it . . . know[s] that the chances are slim to none that Flagstar's regulators will approve the [c]onsulting [p]ayment (or any other payment to Mr. Campanelli) without the application being supported by Flagstar and [made with] Flagstar's certification."  Compl. ¶ 64.

Under the terms of the Employment Agreement, Campanelli's SERP payment became payable when he turned 62 in August 2018.  *Id.* ¶ 65.  Flagstar, however, did not make the SERP payment nor contact Campanelli about it.  *Id.* ¶ 66.  In December 2018, counsel for Campanelli contacted Flagstar to request payment of the SERP.  *Id.* ¶ 67.  Counsel supplied Flagstar with letters of support from four former Flagstar employees who had worked closely with Campanelli

and attested to "the excellent work [he] did for" the Bank. *Id.* ¶ 68. Flagstar, through counsel, responded in a February 2019 letter that it took the same position regarding the SERP as it had adopted regarding the consulting payment: The "continued deterioration of Flagstar's condition during Mr. Campanelli's tenure leading to the 2012 [OCC] cease and desist order and violations of federal consumer financial laws, including violations that occurred while Mr. Campanelli was President and [CEO] of Flagstar, resulting in the 2014 Consent Order with the [CFPB] . . . prevent[s] Flagstar from making the necessary certifications to seek approval to pay the consulting fees and the SERP [p]ayment to Mr. Campanelli." Cohen Decl., Ex. 9 ("Feb. 2019 Letter") at 1; *see also* Compl. ¶ 69. Flagstar again suggested that Campanelli could apply for regulatory approval for the payments directly, without the Bank's support. *See* Feb. 2019 Letter at 4; Compl. ¶ 70. After receiving Flagstar's letter, Campanelli commenced this lawsuit.

### C.   Procedural History

On August 5, 2019, Campanelli filed his Complaint, Dkt. 1, and on September 19, 2019, a redacted version of the Complaint with leave of the Court, *see* Compl. On September 26, 2019, Flagstar filed a motion to dismiss, Dkt. 18; a supporting memorandum of law in support, Dkt. 19 ("Def. Mem."); and the Declaration of Jacob E. Cohen, Esq., Cohen Decl., with attached exhibits. On November 8, 2019, Campanelli filed a memorandum of law in opposition. Dkt. 30 ("Pl. Opp'n"). On November 26, 2019, Flagstar filed a reply. Dkt. 32 ("Def. Reply"). On December 13, 2019, with the Court's leave, Campanelli filed a sur-reply. Dkt. 40 ("Pl. Sur-Reply").

## II.   Applicable Legal Standards

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

For the purpose of resolving a motion to dismiss, the Court must assume all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff.  *See Koch*, 699 F.3d at 145.  That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III.   Discussion

The Court begins by determining which of the exhibits attached to the Cohen Declaration are properly before the Court in connection with Flagstar's motion to dismiss.  The Court then turns to Campanelli's claims, addressing first his ERISA claim, then his claims for breach of contract and, finally, his claims of a breach of the implied covenant of good faith and fair dealing.  The Court concludes that the Complaint adequately alleges a violation of ERISA and breaches of the Employment Agreement and the Consulting Agreement.  The Court dismisses the claims for a breach of the implied covenant as duplicative and therefore moot.

### A.   Materials Properly Before the Court

At the threshold, the Court must determine whether the documents submitted in the Cohen Declaration, on which defendants heavily rely, are properly considered at the motion to dismiss stage.  "A complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (internal quotation marks and citations omitted)

11

(collecting cases).  "Where a document is not incorporated by reference, the court may

nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby

rendering the document 'integral' to the complaint."  *Id.* (quoting *DiFolco*, 622 F.3d at 111);

*Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006).  The Second Circuit has explained

that a "necessary prerequisite for taking into account materials extraneous to the complaint is that

the plaintiff rely on the terms and effect of the document in drafting the complaint; mere notice

or possession is not enough."  *Nicosia*, 834 F.3d at 231 (emphasis omitted) (internal quotation

marks omitted).

Where a defendant's motion to dismiss improperly includes a document that is neither

incorporated by reference in the complaint nor integral to it, a district court must either ignore

the extraneous document or convert the motion to dismiss into a motion for summary judgment

and allow discovery to proceed before ruling.  Fed. R. Civ. P. 12(d).

The Cohen Declaration attaches 13 exhibits: (1) the Separation Agreement; (2) the

October 2012 Letter; (3) the November 2012 Letter; (4) the January 2013 Letter; (5) the

February 2013 Letter; (6) the May 2013 Letter; (7) the October 2016 Letter; (8) the November

2018 Letter; (9) the February 2019 Letter; (10) FDIC Financial Institution Letter FIL-66-2010,

*Guidance on Golden Parachute Applications*, dated October 14, 2010, Cohen Decl., Ex. 10 (the

"FDIC Guidance"); (11) the OCC Consent Order, *In re Flagstar Bank, F.S.B.*, No. 2012-230, *id.*,

Ex. 11; (12) a Securities & Exchange Commission Form 8-K filed by Flagstar on October 23,

2012, *id.*, Ex. 12 (the "Flagstar 8-K"); and (13) the CFPB Consent Order, *In re Flagstar Bank,

F.S.B.*, CFPB No. 2014-CFPB-0014, *id.*, Ex. 13.  The first nine exhibits (the Separation

Agreement and the correspondence) can all be fairly said to be incorporated by reference into the

Complaint.  *See* Compl. ¶¶ 4–70.  The Court may therefore properly consider these exhibits in resolving the motion to dismiss.  *Nicosia*, 834 F.3d at 230.

The OCC Consent Order and the CFPB Consent Order present a closer question.  These are referred to in the Complaint, but it is less apparent that Campanelli "rel[ied] on the terms and effect of the document[s] in drafting" the Complaint.  *See Nicosia*, 834 F.3d at 231 (internal quotation marks omitted).  Nevertheless, "[a]lthough the general rule is that a district court may not look outside the complaint and the documents attached thereto in ruling on a Rule 12(b) motion to dismiss, [the Second Circuit has] acknowledged that the court 'may also consider matters of which judicial notice may be taken.'"  *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991)).  This is so even if the document is not incorporated by reference or integral to the complaint.  *See Kramer*, 937 F.2d at 773.  The OCC and CFPB consent orders qualify as such documents.  *Cont'l Cas. Co. v. Marshall Granger & Co., LLP*, 921 F. Supp. 2d 111, 117 (S.D.N.Y. 2013); *see also Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 294 n.3 (S.D.N.Y. 2019); *Riverkeeper, Inc. v. Mirant Lovett, LLC*, 675 F. Supp. 2d 337, 344 n.7 (S.D.N.Y. 2009).  The Court may not, however, rely upon them for the truth of the matters asserted without converting the motion into a motion for summary judgment.  *Staehr*, 547 F.3d at 425.  The Court will therefore take judicial notice of their existence but, in resolving the motion to dismiss, will not rely upon the truth of any representations therein.

Finally, the FDIC Guidance and the Flagstar 8-K are neither referred to nor relied upon by the Complaint in any way.  However, they, too, fall within the realm of documents of which the Court may take judicial notice.  *See Cont'l Cas. Co.*, 921 F. Supp. 2d at 117.  Therefore the

Court will also take judicial notice of their existence in resolving the motion to dismiss, but cannot consider any representations therein for the truth of the matters asserted.

### B.      Campanelli's Claim for Denial of ERISA Benefits

ERISA creates a private right of action to enforce the provisions of a retirement benefits plan.  *See* 29 U.S.C. § 1132(a)(1)(B).  It provides, in pertinent part, that "[a] civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  *Id.*  To make out a *prima facie* case of the denial of benefits under ERISA, a complaint must adequately allege that "(1) the plan is covered by ERISA, (2) plaintiff is a participant or beneficiary of the plan, and (3) plaintiff was wrongfully denied [benefits] owed under the plan."  *Giordano v. Thomson*, 564 F.3d 163, 168 (2d Cir. 2009) (internal citations omitted).

Here, Campanelli's Complaint alleges that the SERP payment is an "employee pension benefit plan" and an "employee benefit plan" within the meaning of 29 U.S.C. § 1002(2) and (3), and that Campanelli is a "participant" of the SERP within the meaning of 29 U.S.C. § 1002(7). Compl. ¶¶ 75–76.  It further alleges that Campanelli was wrongfully denied the benefit of the SERP.  *Id.* ¶¶ 77–78.

Flagstar moves to dismiss the ERISA claim based solely on the third element of the *prima facie* case.  Def. Mem. at 25.  It disputes that Campanelli "was wrongfully denied [benefits] owed under the plan[.]"  Flagstar argues, in essence, that Campanelli was not *wrongfully* denied the SERP payment because Flagstar is legally powerless to make it.  *See id.* That is so, Flagstar argues, because it cannot make the payment without the permission of the Bank's regulators, *id.* at 15–16, and it is unable to make, under penalty of perjury, the factual representations to its regulators that are a prerequisite to seeking such permission, *id.* at 16–21;

14

*see also id.* at 1–5.  In the alternative, Flagstar argues that nothing prevents Campanelli from seeking such regulatory approval himself, without the Bank's support.  *Id.* at 21.

Flagstar's argument is therefore that the Court should dismiss Campanelli's ERISA claim because Flagstar's *own determination* that it is powerless to seek its regulators' permission to make the SERP payment is sufficient to defeat this claim as a matter of law.  The Court is unpersuaded.  Flagstar relies primarily on the 2014 CFPB Consent Order to justify its position that it is barred from seeking permission to make the SERP payment and to justify its change of position on this point from 2013, when it sought such approval from the FDIC and the Federal Reserve.[4]  *Id.* at 17, 19–20; *see also id.* at 1–5.  Specifically, Flagstar contends that, in light of the CFPB Consent Order, it can no longer truthfully represent to regulators that "it does not possess and is not aware of any information, evidence, documents or other materials which would indicate that *there is a reasonable basis to believe*" that Campanelli (1) "has committed any fraudulent act or omission, breach of trust or fiduciary duty, or insider abuse . . . that has had or is likely to have a material adverse effect on the institution"; (2) "is *substantially responsible* for the insolvency of, the appointment of a conservator or receiver for, or the troubled condition" of the Bank; or (3) "*has materially violated* any applicable federal or state banking law or regulation that has had or is likely to have a material effect on the" Bank.  *Id.* at 19–20; *see also* 12 C.F.R. § 359.4(a)(4) (emphasis added).

---

[4] Flagstar also points to the 2012 OCC Consent Order and the 2010 OTS Agreements as ostensibly also barring it from seeking regulatory permission.  Def. Mem. at 2, 11 n.7, 12–13, 17.  But these remedial agreements were already in place when Flagstar, in 2013, applied to its regulators for permission to make the SERP payment.  Viewing the facts in the light most favorable to Campanelli, the Court finds, for the purpose of resolving this motion, that—consistent with Flagstar's 2013 application—neither agreement bars Flagstar from again seeking its regulators' approval.

Flagstar's argument that its say-so on these points must be credited on a motion to dismiss is plainly improper.  Campanelli's Complaint adequately pleads that he has met all conditions precedent to receive the SERP payment.  Flagstar is entitled to dispute this, but its disagreement with Campanelli on these points presents a quintessential factual question which must be tested in discovery.  Discovery may validate Flagstar's present position on these points.  Or it may not.  It may show instead, for example, that Flagstar's change of position is traceable not to newly discovered facts but to the change in the Bank's leadership.  Flagstar's bid to have its position on these issues credited is all the more inappropriate given that Flagstar has not offered cognizable support for its claim, let alone evidence that conclusively establishes Campanelli's lack of entitlement.  Instead, in contending that it cannot seek regulatory approval and hence is "expressly prohibit[ed]" from making the SERP payment, *see* Def Mem. at 4, 25, Flagstar relies on attorney argument, which is not evidence, and the CFPB Consent Order.  Although the Court may take judicial notice of the existence of the CFPB Consent Order, it cannot consider the contents of the report for the truth of the matters stated therein.[5]  That the

---

[5] In any event, even if the CFPB Consent Order could be considered for the truth of the matters asserted, the portion of that order relied upon by Flagstar would not establish Campanelli's lack of entitlement.  The Consent Order refers to problems within Flagstar's loss mitigation department between 2011 and 2014.  The one paragraph in that order on which Flagstar relies for its theory that *Campanelli* was substantially responsible for the troubled condition of the Bank, Def. Mem. at 3, 5, 13, states merely that Flagstar:

> "restructured the loss mitigation department and hired additional staff in late 2011. Despite these changes, the loss mitigation department remained under-resourced. By December 2012, the department had over 100 open positions. [Flagstar] often replaced experienced staff with agency temp employees.  Former managers testified that staff quit because Respondent paid under market rates. *They also testified that senior management repeatedly rejected their requests to increase staff salaries*."

CFPB Consent Order ¶ 23 (emphasis added).  Even if this reference were read to implicitly refer to Campanelli, the attribution to him of responsibility for not approving staff salary increases

Bank was required to enter into a consent order does not alone establish, as a matter of law, Campanelli's responsibility for the Bank's (continued) troubled condition.  In any event, even if inferences could be drawn from these materials that favored Flagstar's position, on a defendant's motion to dismiss, it is black-letter law that the Court may not draw factual inferences for a defendant that, even if rational, are arguable.  *See Edrei v. Maguire*, 892 F.3d 525, 539 (2d Cir. 2018) ("Perhaps this is an inference that a factfinder might ultimately make, but at [the motion to dismiss stage] stage [the Court] must draw all inferences in favor of the plaintiffs, not the defendants.").

The Court accordingly holds that the Complaint adequately pleads a *prima facie* case of an ERISA violation.  The Court therefore denies Flagstar's motion to dismiss Campanelli's ERISA claim.

### C.     Campanelli's Claims for Breach of Contract Under New York Law

Campanelli's Complaint brings two claims for breach of contract under New York law: one for Flagstar's failure to make the consulting payment, and another for its failure to make the SERP payment.  The *prima facie* showing required under New York law is the same for both claims.  A complaint for breach of contract need allege only: "(1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages."  *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (citation omitted); *Belle Lighting LLC v. Artisan Constr. Partners LLC*, 116 N.Y.S.3d 31, 32–33 (1st Dep't 2019) ("[T]o make a prima facie case on its breach of contract claim, plaintiff had to demonstrate the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages[.]" (internal

_____

falls very far short of assigning him responsibility for the Bank's overall troubled condition.

quotation marks omitted)).  The complaint must also allege the specific provisions of the contract upon which liability is based.  *Sud v. Sud*, 621 N.Y.S.2d 37, 38 (1st Dep't 1995).

### 1.      Breach of Sections 1.06 and 4.02 of the Employment Agreement

The Complaint alleges that Flagstar is in breach of two provisions of the Employment Agreement.  In moving to dismiss this claim, Flagstar argues that it is not in breach of either and that Campanelli has not suffered damages.

The Complaint first alleges that Flagstar breached § 1.06 of the Employment Agreement by not making the SERP payment after Campanelli's 62nd birthday.  Compl. ¶¶ 83–85.  Flagstar argues that it was not obligated to perform under the Employment Agreement because regulatory approval of the SERP was an unfulfilled condition precedent.  Def Mem. at 14–16.  Critically, however, Flagstar does not argue—let alone establish based on cognizable materials—that it sought, but was denied, regulatory approval.  Instead, it argues that, because of the CFPB Consent Order, it was under no obligation to seek such approval in the first place.  *Id.* at 16–21.  Specifically, Flagstar argues—as it does in moving to dismiss the ERISA claim—that as a matter of law, it was unable to seek the regulatory approval needed to make the SERP payment because it was unable truthfully to make the required attestations under the Golden Parachute Regulations.  *See id.*; *see also id.* at 1–5.  For the same reasons discussed above in connection with the ERISA claim, this argument is insufficient to sustain Flagstar's motion to dismiss.  Flagstar is at liberty to pursue the same argument on summary judgment, if the facts adduced in discovery supply a non-frivolous basis to so contend.

The Complaint separately alleges that Flagstar breached § 4.02 of the Employment Agreement by failing to "cooperate in good faith to endeavor to meet the TARP Requirements and other applicable law in a manner which preserves to the greatest extent possible the intent and purposes of th[e] Agreement."  Compl. ¶ 86.  It alleges that Flagstar breached this provision

by failing to apply for regulatory approval to make the SERP Payment, and by "failing to support the application, including without limitation by submitting a certification pursuant to 12 C.F.R. § 359.4(a)(4)." *Id.* ¶ 86. Flagstar argues that it has done all it is contractually obliged to do, which, in its view, as reviewed above, does not include seeking permission from regulators to make the SERP payment, because such an application would require it to make "certifications that Flagstar believes are not true . . . ." Def. Mem. at 22–23.[6] But determining whether Flagstar has acted in good faith under the terms of the Employment Agreement requires a resolution of the same factual disputes that preclude resolving the ERISA claim on the pleadings. *See, e.g.*, *Hildene Cap. Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.*, No. 11 Civ. 5832 (AJN), 2012 WL 3542196, at *8 (S.D.N.Y. Aug. 15, 2012) ("[G]ood faith and reasonable beliefs are questions of fact not appropriate for resolution as a matter of law" at the motion to dismiss stage); *cf. Kelly-Brown v. Winfrey*, 717 F.3d 295, 313 (2d Cir. 2013) (court's role "in considering a motion to dismiss is not to resolve . . . factual disputes").

Finally, as to both provisions of the Employment Agreement, Flagstar argues that Campanelli has not suffered damages from its refusal to seek regulatory approval for the SERP payment because Campanelli can apply for approval on his own, without the Bank's support. Def. Mem. at 23–24. The Complaint alleges adequate facts, however, to call into question

---

[6] Flagstar, in its Reply, raises for the first time the additional argument that a court order compelling it to make a certification to the Bank's regulators that it believes to be untruthful would violate its First Amendment rights. Def. Reply at 9–10. This argument is premature. The issue at hand is solely whether the Complaint adequately alleges that Flagstar has improperly denied Campanelli the two payments, and it does. Whether Flagstar had a sound basis for declining to make the requisite certifications to the regulators is a question that can be resolved only after discovery. Flagstar's reply argument—that the First Amendment would be breached by a court order compelling Flagstar to make factually incorrect statement(s) in an application for regulatory approval for the SERP payment—similarly turns on Flagstar's as-yet-untested premise that statements to the effect that Campanelli is qualified to receive the payment would be inaccurate.

whether such an avenue for relief would be as effective or instead illusory.  Discovery is needed
to test whether Flagstar is correct that its submission of the request for approval is of no
consequence.

The Court therefore denies Flagstar's motion to dismiss the Complaint's breach of
contract claims as to both § 1.06 and § 4.02 of the Employment Agreement.

### 2.    Breach of Sections 3 and 13 of the Consulting Agreement

The Complaint alleges that Flagstar has also breached two provisions of the Consulting
Agreement.  Here, too, in moving to dismiss, Flagstar disputes that it has breached and that
Campanelli has been damaged.

The Complaint alleges that Flagstar breached § 3 of the Consulting Agreement by failing
to pay Campanelli the approximately $1.8 million consulting payment in compensation for the
work he completed in the six months following his resignation as CEO, including assisting the
new CEO's transition and facilitating the sale of the bank's commercial loan and lease positions.
Compl. ¶¶ 36–38.  As with the Employment Agreement, Flagstar argues that it has no obligation
to make the consulting payment because regulatory approval for the consulting payment is an
unfulfilled condition precedent, and that the CFPB Consent Order prevents Flagstar from seeking
such approval.  *See* Def Mem. at 14–21.  For the same reasons reviewed above, this defense
cannot be resolved on the pleadings, and instead requires discovery.

The Complaint also alleges that Flagstar breached § 13 of the Consulting Agreement by
failing to "exercise its best reasonable efforts to obtain the approval of the Board of Governors of
the Federal Reserve System, and the concurrence of the FDIC, to make the payments provided
herein . . . ."  Compl. ¶ 92.  Specifically, Campanelli alleges that Flagstar breached this provision
by failing to apply for required regulatory approval to make the consulting payment, and by
"failing to support the application, including without limitation by submitting a certification

pursuant to 12 C.F.R. § 359.4(a)(4)." *Id.* As with the Complaint's claims for breach of the

Employment Agreement, there is no basis to resolve this dispute in Flagstar's favor on the

pleadings. *See Hildene Cap. Mgmt*, 2012 WL 3542196, at *8. The facts developed in discovery

may, or may not, substantiate Flagstar's claim, *see* Def. Mem. at 22–23, that it was excused from

its contractual obligation to apply for the necessary regulatory approval.

As for Flagstar's argument that the Complaint fails to adequately allege damages, Def.

Mem. at 23–24, it fails for the same reason as its similar argument relating to the Employment

Agreement. The Complaint adequately alleges that Campanelli has been harmed by Flagstar's

failure to seek regulatory approval to make the payments on his behalf. Whether an application

to the relevant regulators without the Bank's support would have an equal or reduced chance of

success is a factual question to be resolved after discovery, either at summary judgment or trial.

The Complaint therefore pleads a *prima facie* case of a breach by Flagstar of the

Consulting Agreement. Flagstar's motion to dismiss this claim is denied.

### D.  Breach of the Implied Covenant of Good Faith and Fair Dealing Under New York Law

Finally, the Complaint brings two claims alleging that Flagstar breached the implied

covenant of good faith and fair dealing as to the Employment Agreement and the Consulting

Agreement, respectively. *See* Compl. ¶¶ 94–104. These claims are brought in the alternative,

"to the extent that Flagstar's conduct . . . does not constitute a breach of the express provisions"

of the two contracts. *Id.* ¶¶ 97, 102. Flagstar moves to dismiss these claims on the basis that, if

Campanelli's breach of contract claims survive, these claims are duplicative of them. *See* Def.

Mem. at 24. Flagstar is correct on this point.

"Under New York law, to state a claim for breach of the implied covenant of good faith

and fair dealing, the plaintiff must allege facts which tend to show that the defendant sought to

prevent performance of the contract or to withhold its benefits from the plaintiff." *Tonra v. Kadmon Holdings, Inc.*, 405 F. Supp. 3d 576, 585–86 (S.D.N.Y. 2019) (internal quotation marks omitted).  The Second Circuit has held that "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) (quoting *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388–89 (1987)).  That is because, under New York law, "it is impermissible . . . to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties." *Clark-Fitzpatrick, Inc.*, 70 N.Y.2d at 389.

Accordingly, when a plaintiff claims a breach of the implied covenant of good faith and fair dealing based on the same facts as a breach of contract claim and seeking identical damages for the breach, the claim for breach of the implied covenant must be dismissed as duplicative of the breach of contract claim. *Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.*, 894 N.Y.S.2d 47, 49–50 (1st Dep't 2010) (citation omitted).  Such is the case here.

Campanelli argues that these claims need not be dismissed at this stage of litigation because they are "asserted in the alternative to, and to the extent [they are] not preempted" by the breach of contract claims.  Pl. Opp'n at 24.  That is incorrect in the circumstances here.  For a complaint's quasi-contract claims to survive a motion to dismiss and be litigated alongside breach of contract claims, a plaintiff must demonstrate that there is either "(1) a bona fide dispute about the existence of a contract; (2) a bona fide dispute about whether the contract covers the full scope of a plaintiff's allegations; or (3) a bona fide dispute about the validity of the

contract," *see Gemma Power Sys., LLC v. Exelon W. Medway II, LLC*, No. 19 Civ. 705 (CM), 2019 WL 3162088, at *12 (S.D.N.Y. July 1, 2019) (internal quotation marks and citations omitted).  Those conditions are not met here, as neither the Complaint nor the briefing on the motion to dismiss even hints at disputes of this nature.  The Complaint's quasi-contract claims are subsumed by the adequately pled breach of contract claims.

The Court therefore grants Flagstar's motion to dismiss the Complaint's two claims for breach of the implied covenant of good faith and fair dealing.

## CONCLUSION

For the foregoing reasons, the Court denies Flagstar's motion to dismiss Campanelli's ERISA and breach of contract claims, but grants Flagstar's motion to dismiss Campanelli's implied covenant of good faith and fair dealing claims.

The Court will, by separate order, schedule an initial pretrial conference.  The Clerk of Court is respectfully directed to terminate the motions pending at dockets 18, 22, and 31.

SO ORDERED.

Paul A. Engelmayer
United States District Judge


Dated: September 4, 2020
      New York, New York

23